**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
Phillip Kim, Esq. (*pro hac vice*)
Jing Chen, Esq. (*pro hac vice*)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
lrosen@rosenlegal.com
pkim@rosenlegal.com
jchen@rosenlegal.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs and
the Putative Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| IN RE CHEETAH MOBILE, INC. SECURITIES LITIGATION | No. 2:20-cv-05696-MWF-PVC |
|---|---|
| | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | <u>JURY TRIAL DEMANDED</u> |

Lead Plaintiffs Guan Wei Mao ("Mao") and Jun Yu's ("Yu") and Named Plaintiff Ning Wang ("Wang," and together with Mao and Yu, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation they conducted by and through their attorneys, which included, among other things, a review and analysis of: (i) Defendants' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Defendants' public filings with Chinese regulatory agencies and their local provincial offices; (iii) public reports and news articles; (iv) transcripts of Defendants' conference calls; (v) interviews with witnesses with relevant information; and (vi) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within Defendants' control or custody. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons and entities that purchased Cheetah Mobile, Inc. ("Cheetah Mobile" or the "Company") securities between

April 26, 2017 and March 24, 2020, inclusive (the "Class Period"). Plaintiffs pursue claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Cheetah Mobile, based in China, purportedly is a leading internet company that offers utility and entertainment applications or "apps" for mobile devices. Advertising was the core business of Cheetah Mobile, contributing approximately 70% of Cheetah Mobile's total revenues. The Company's "advertising customers," who place advertisements on Cheetah Mobile apps, work either directly with the Company or indirectly through global search engines and mobile advertising networks, such as Google, Facebook and Yahoo.

3.      Google had been Cheetah Mobile's largest customer since 2017. Google generated 15.2%, 14.4% and 21.9% of Cheetah Mobile's total revenues for 2017, 2018 and 2019, respectively, and served advertisements, Google search boxes and search queries and other links on Cheetah Mobile's applications. Google also promoted Cheetah Mobile's apps at the Google Play "store," and which made the Company's apps easily available to Google's massive user base. By distributing its applications for free through global distribution channels such as Google Play and iOS (*i.e.*, Apple) App Store, Cheetah Mobile was able to attract 600 million monthly active users worldwide.

4.     Both the Chinese and international markets are critical to the Company's financial performance. Approximately 40% of its revenues were from China and 60% from outside China from 2017 to 2019.

5.     In its SEC filings and public statements, Cheetah Mobile repeatedly stated that it made the "utmost effort" to comply with relevant laws and regulations and was dedicated to complying with all relevant Google policies. Even after the media revealed that Cheetah Mobile had overcharged advertisers for false "click throughs" on advertisements on its apps in 2018, the Company still denied any improper practices that were inconsistent with its previous disclosures and reassured the public that the Company was committed to legal and regulatory compliance. Unbeknownst to investors, however, at the same time it was touting its commitment to legal and regulatory compliance, the cornerstone of Cheetah Mobile's business was illegal, impermissible, and disruptive advertising practices like clickbait, prohibited interstitial ads, false security alerts that redirected users to download third party applications, interruptions of apps' usability flow by leading users to click through many irrelevant pages. Defendants engaged in these practices even though they knew that they violated Chinese regulations and Google's policies against invasive maneuvers to disrupt key device functions, which put the Company's revenues and financial performance at risk by, among other things,

making it virtually certain that the Company's apps would be banned from the Google Play store.

6.     Defendants knew that their practices violated Google's policies because Google had warned them repeatedly that the Company's apps violated those policies. For example, in 2018 and 2019, after detecting malicious functions in Cheetah Mobile's apps, Google warned the Company and demanded that it address the violations. Cheetah Mobile even had had a special committee headed by Defendant Jiang with employees from Security Department and Legal Department since 2018, specifically dedicated to working with Google and redressing violations against Google policies on a regular basis. Cheetah Mobile, however, continued its improper practices. Ultimately, Cheetah Mobile's course of conduct resulted in Google removing all Cheetah Mobile applications from the Google Play store and terminating Cheetah Mobile's Google Play Store, Google AdMob and Google AdManager accounts and the associated contracts on February 20, 2020.

7.     On February 20, 2020, Google announced that it removed from Google Play store over 600 apps that violated Google anti-disruptive ads polices. A news article published by Buzzfeed on the same day speculated that Google's ban included the majority of Cheetah Mobile's apps. On this news, the price of the Company's American depositary shares ("ADS," or "shares"), which are traded on

the New York Stock Exchange ("NYSE"), fell $0.15 per ADS, or 4%, to close at $3.6 per ADS on February 20, 2020, on unusually heavy trading volume. The Company disclosed the ban on February 21, 2020, and, as a result, the price of its ADS fell $0.61, or nearly 17%, to close at $2.99, on a heavy trading volume of nearly 2 million ADSs traded.

8.      The other shoe dropped on March 24, 2020, when Cheetah Mobile disclosed in its financial results for the fourth quarter and full year ended December 31, 2019. As part of that disclosure, the Company announced that Google had denied Cheetah Mobile's request to reinstate its accounts after a thorough review. Cheetah Mobile's ADS further dropped $0.07 per ADS, or 3.3% to close at $2.04 per share on February 21, 2020, on a heavy trading volume of over 1 million ADSs traded.

9.      The two declines caused by Cheetah Mobile's disclosures of Google's removal collectively erased approximately $24 million in shareholder value.

10.     Google's ban devastated the Company's performance. In press releases filed with the SEC on Form 6-K on June 10, 2020, August 18, 2020 and November 25, 2020, the Company reported that, as a result of the ban, the revenues from its mobile utility product business in overseas markets had decreased by 62.6%, 68.4%, 72% year over year in the first, second, and third quarters of 2020, respectively. Those Forms 6-K further disclosed that revenues from the Company's

mobile games business had decreased by 5.3%, 38.0%, 47.0% during the same periods.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because certain of the acts and conduct complained of herein occurred in this District.

14.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

15.     Lead plaintiff Mao acquired Cheetah Mobile securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and material omissions alleged herein. His PSLRA

certification has been previously filed with the Court and is incorporated by reference herein.

16.     Lead plaintiff Yu acquired Cheetah Mobile securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and material omissions alleged herein. His PSLRA certification has been previously filed with the Court and is incorporated by reference herein.

17.     Named plaintiff Wang acquired Cheetah Mobile securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and material omissions alleged herein. His PSLRA certification has been previously filed with the Court and is incorporated by reference herein.

18.     Defendant Cheetah Mobile is incorporated under the laws of the Cayman Islands and has its principal executive offices located in Beijing, China. Cheetah Mobile's ADS trade on the NYSE under the symbol "CMCM."

19.     Defendant Sheng Fu ("Fu") is and, at all relevant times during the Class period, was the Company's Chief Executive Officer ("CEO"). He has been a director of the Board of the Company since November 2010 and the Chairman of the Board since March 2018.

20.     Defendant Yuk Keung Ng ("Ng") was the Company's Chief Financial Officer ("CFO") during the transition period after the Company's former CFO, Ka Wai Andy Yeung, resigned in March 2017 to when Defendant Vincent Zhenyu Jiang ("Jiang") became CFO on April 10, 2017. Defendant Ng reviewed the Company's 2016 20-F for the year ended December 31, 2016 ("2016 20-F") and signed the Certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") annexed to 2016 20-F as Cheetah Mobile's principal financial officer.

21.     Defendant Jiang was the Company's CFO from April 10, 2017 to January 31, 2020.

22.     Defendant Thomas Jintao Ren ("Ren") has been the Company's CFO since January 31, 2020.

23.     Defendants Fu, Ng, Jiang and Ren are collectively referred to herein as the "Individual Defendants."

24.     Each of the Individual Defendants:

    a.     directly participated in the management of the Company;

    b.     was directly involved in the day-to-day operations of the Company at the highest levels;

    c.     was privy to confidential proprietary information concerning the Company and its business and operations;

d.    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.    approved or ratified these statements in violation of the federal securities laws.

25.    Cheetah Mobile and the Individual Defendants are referred to herein, collectively, as the "Defendants."

26.    Cheetah Mobile is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

27.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed Cheetah Mobile under *respondeat superior* and agency principles.

**Former Employee Witnesses**

28.     Former employee 1 ("FE 1")[1] was the Director of Global Marketing and Communication of Cheetah Mobile from December 2014 until August 2019. FE 1 directly reported to Ms. Jie Xiao ("Xiao"), director of Cheetah Mobile since March 2018 and senior vice president of Cheetah Mobile since November 2014. During the Class Period, Ms. Xiao was in charge of business development, marketing, and commercial products.

29.     FE 1 served as a spokesperson and media contact for Cheetah Mobile in the United States. FE 1 oversaw the Company's U.S. marketing strategy, social media presence, and product branding. FE 1 also participated in Cheetah Mobile's corporate communications. In this role, FE 1 frequently interacted with top executives of Cheetah Mobile to determine responses to media inquiries and was involved in communications with U.S. companies.

30.     When FE 1 started at the Company, Cheetah Mobile had a New York office in addition to its U.S. base in California. In approximately 2016, most of the Company's U.S. workforce was relocated to China or laid off. FE 1 remained in New York with some workers who worked on Live.Me, one of Cheetah Mobile's apps. FE 1 traveled to Cheetah Mobile's office in the San Francisco Bay area about

---

[1]  All former employees ("FEs") are referred to in the masculine to preserve their anonymity.

once per month and to the Company's headquarters in China approximately four times a year.

31.   Former Employee 2 ("FE 2") was Cheetah Mobile's Public Relations Manager from March 2016 until October 2017. As Public Relations Manager, FE 2 used his established connections with media contacts covering the tech industry to pitch stories to news outlets about Cheetah Mobile and its apps. FE 2 also responded to media inquiries. FE 2 reported to FE 1 and worked at a Cheetah Mobile office in Cupertino, California.

32.   Former Employee 3 ("FE 3") was a data product manager at Cheetah Mobile from August 2015 to June 2020 in Beijing, China. FE 3 was mainly responsible for the data analysis and promotional affairs of Cheetah Mobile. FE3's position was three levels below Cheetah Mobile's CEO, Defendant Fu. FE 3 resigned from Cheetah Mobile in June 2020 after a corporate reorganization after Google banned Cheetah Mobile apps from its store.

## DEFENDANTS' WRONGDOING

### *Cheetah Mobile's Business Model*

33.   Cheetah Mobile is a China-based mobile application developer. Throughout the Class Period, the Company relied on major mobile application distribution channels such as Google Play and iOS App Store and various advertising platforms to distribute its apps.

34.     Cheetah Mobile's apps included a wide range of utility tools from file management applications to antivirus software for mobile devices. They also included mobile entertainment products, like the live streaming platform Live.Me, and games.

35.     Cheetah Mobile offered substantially all of its applications for free and had successfully attracted hundreds of millions of monthly active users globally according to its annual reports on SEC Form 20-F for the years ended December 31, 2016 through December 31, 2019.[2]   Cheetah Mobile's flagship utility apps are Clean Master, Security Master and CM Launcher, which together have been downloaded more than 4.4 billion times globally.[3] Its game apps together have been downloaded more than 2 billion times.[4]   In addition, Cheetah Mobile's proprietary cloud-based data analytics engines form the core of its utility products. For users of Cheetah Mobile's utility applications, the data analytics engines perform real time analysis of mobile applications, program files and websites on their devices for behavior that may impair system performance or impose security risks.

36.     Utilizing its massive user base, during the Class Period Cheetah Mobile generated a significant portion of its revenues from selling advertising to on

---

[2]  Hereinafter referred to as "2016 20-F", "2017 20-F", "2018 20-F" and "2019 20-F."
[3]  https://www.cmcm.com/en/, last viewed March 15, 2021.
[4]  *Id.*

its utility and game applications. Mobile advertising revenue represented 69% of Cheetah Mobile's total annual revenue in 2016.[5] In 2019, Mobile advertising revenue represented approximately 85.4% of the Company's revenues from its utility products and related services business.[6]

37.     Cheetah Mobile's ad serving technology places ads on its apps based on the combination of the app user's unique attributes and the real-time comparison of bids from eligible ads.

38.     Before Google banned its applications, Cheetah Mobile was one of the biggest publishers in the Google Play store. Several of the Company's apps were among the most popular productivity apps in the store. Google had been Cheetah Mobile's largest customer since 2017, and contributed 15.2%, 14.4% and 21.9% of its total revenue for 2017, 2018 and 2019, respectively.

***Laws and Policies Regarding Disruptive Ads and Enforcement***

39.     Because Cheetah Mobile significantly relied on mobile application distribution channels such as Google Play to distribute most of its mobile applications to users, it was required to follow such distribution platforms' standard terms and policies for application developers. Additionally, Cheetah Mobile was

---

[5] Cheetah Mobile did not disclose the amounts of its advertising revenues for 2017 and 2018.
[6] Cheetah Mobile did not disclose the amounts of its advertising revenues received from game apps in 2019.

also required to comply with relevant laws and regulations. In its 2016-2019 Form 20-Fs, Cheetah Mobile repeatedly reassured the investing public that since its inception, the Company had worked "to make the utmost effort to comply with relevant laws and regulations."

40.     Beginning in 2017, Google started taking serious measures to improve user experience for users downloading apps from the Google Play store and implemented polices prohibiting disruptive ads on applications downloaded from Google Play Store.[7] Google defines disruptive ads as "ads that are displayed to users in unexpected ways, including impairing or interfering with the usability of device functions."[8] Disruptive ads include interstitial ads, or full-screen ads that cover the interface of their host app.[9] Google's policies also require applications to give a user the choice to either tap on the ad and continue to its destination or to close the ad and return to the app. [10] Google considers disruptive ads as "an invasive maneuver that results in poor user experiences that often disrupt key device

---

[7] https://gadgetstouse.com/blog/2017/12/01/google-lockscreen-ads/, last viewed March 15, 2021.
[8] https://security.googleblog.com/2020/02/disruptive-ads-enforcement-and-our-new.html, last viewed March 15, 2021.
[9] https://developers.google.com/admob/android/interstitial-fullscreen, last viewed March 15, 2021.
[10] *Id.*

functions and this approach can lead to unintentional ad clicks that waste advertiser spend." [11]

41.     Below are examples of common disruptive ads and interstitial ads that Google prohibits[12][13]:

a.  Ads that take up the entire screen or interfere with normal use and do not provide a clear means to dismiss the ad.

b.  Ads that force the user to click through to the advertiser's content by using a false dismiss button, or by making ads suddenly appear in areas of the app whether the user usually taps for another function.

c.  An ad that is using a false dismiss button.

d.  An ad that suddenly appears in an area where the user is used to tapping for in-app functions.

e.  Apps that trigger an interstitial ad every time a user clicks within the app.

f.  Ads that prevent viewing the app's core content.

---

[11]  https://security.googleblog.com/2020/02/disruptive-ads-enforcement-and-our-new.html, last viewed March 15, 2021.
[12]  https://support.google.com/googleplay/android-developer/answer/9857753#!?zippy_activeEl=disruptive#disruptive&zippy=%2Cexamples-of-common-violations, last viewed March 15, 2021.
[13]  https://support.google.com/admob/answer/6201362?hl=en#zippy=%2Cdisallowed-example-recurring-interstitials%2Cdisallowed-example-interstitials-that-impact-navigation, last viewed March 15, 2021.

g.  ads that interfere with navigating or interacting with the app's core content and functionality.

h.  Placing an interstitial ad immediately after another interstitial ad was shown to and closed by the user.

i.  Placing interstitial ads so that they suddenly appear when a user is focused on a task at hand (e.g., playing a game, filling out a form, reading content).

42.     Defendants knew that Google was actively policing apps in the Google Play store because Google began banning large numbers of applications for policy violations. For example, in 2017, Google removed 320,000 app publishers from its ad network for violating Google's policies, and also blacklisted nearly 90,000 websites and 700,000 mobile apps.[14]

43.     In addition, In July 2019, Google banned CooTek, a mobile application developer, and all its applications from Google's platform after it was found that CooTek applications continued to bombard users with disruptive ads even after CooTek claimed it had stopped the behavior.[15]  After it banned CooTek, a Google spokesperson told BuzzFeed News that more removals would follow in the Google

---

[14] https://blog.google/technology/ads/advertising-ecosystem-works-everyone/, last viewed March 15, 2021.
[15] *See* https://blog.lookout.com/beitaplugin-adware, last viewed March 15, 2021; *also see* https://www.buzzfeednews.com/article/craigsilverman/google-banned-cootek-adware, last viewed March 15, 2021.

Play store as Google continued its enforcement activities. "Our Google Play developer policies strictly prohibit malicious and deceptive behavior, as well as disruptive ads. When violations are found, we take action," said the Google spokesperson.[16]

44.    In September 2019, Google removed 49 applications developed by iHandy from the Google Play store and banned them from monetizing on Google's ad network due to deceptive or disruptive ads. "Our Google Play developer policies are designed to help create the best experience for users, and we explicitly prohibit deceptive or disruptive ads. When violations are found, we take action," said a statement from a Google spokesperson.[17]

45.    Chinese law also prohibits disruptive advertising practices. The Advertisement Law of the People's Republic of China (amended in 2015 and 2018) and the Interim Measures for the Administration of Internet Advertisements, promulgated by the SAIC [18] (effective September 1, 2016), require internet advertising publishers and advertising operators to, among other things, refrain

---

[16] *Id.*

[17] https://www.buzzfeednews.com/article/craigsilverman/sweet-camera-play-store-removed-ihandy, last viewed March 15, 2021.

[18] Up until 2018, the State Administration of Industry and Commerce of the People's Republic of China ("SAIC") was the Chinese government body that regulates industry and commerce in China. Those responsibilities are now undertaken by the State Administration for Market Regulation ("SAMR"). SAMR/SAIC is/was primarily responsible for business registrations, issuing and renewing business licenses and acts as the government supervisor of companies and enterprises.

from interrupting normal internet use with advertisements, or inducing users to open an advertisement in a deceptive manner.[19]  Violation of these regulations may result in penalties, including fines, confiscation of advertising income, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information, revocation of offenders' licenses or permits for their advertising business operations. Defendants were well aware of these regulations, because Cheetah Mobile referenced them repeatedly in its each of the annual reports on Form 20-F that it filed from 2016 to 2019.

***Cheetah Mobile's Disruptive Advertising Practices***

46.    During the Class Period, without the investing public's knowledge, and contrary to its public statements, Defendants caused Cheetah Mobile to actively employ disruptive advertising on virtually all the Company's apps in violation of Google policies and Chinese law. This knowing and improper use of disruptive advertising practices subjected the Company to the substantial risk of being banned by Google and experience a substantial decrease in revenues and overall financial performance.

---

[19] http://www.npc.gov.cn/zgrdw/npc/xinwen/2018-11/05/content_2065663.htm;  http://gkml.samr.gov.cn/nsjg/ggjgs/201902/t20190215_281605.html, last viewed March 15, 2021.

47.     FE 2 explained to Plaintiffs' investigator that when Cheetah Mobile launched a new app or wanted to promote an app to the news media, FE 2 would download the app himself. FE 2 did this so he would understand its features and be able to speak to media about the app. FE 2 said that many Cheetah Mobile apps had ads that "led users down rabbit holes," redirected users to the Google Play store to download another app, or interrupted the flow in usability of the apps. FE 2 stated that it was a particular problem with CleanMaster and SecurityMaster, the two Cheetah Mobile apps that were supposed to improve the performance of a users' phone. In reality, the in-app advertisements would falsely tell users that the app had found a security concern on their phones. When users clicked on it, they would be redirected to download another app on the Google Play store. Sometimes, the ads also directed users to download third-party apps. FE 2 raised his concerns about this deceptive practice to FE 1.

48.     FE 2 also raised his concerns about the usability issue caused by disruptive ads on CleanMaster and SecurityMaster. These applications led users to click through dozens of pages and it was difficult for users to navigate their way back. Instead, the applications directed users "down a rabbit hole".

49.     When FE 2 tried to pitch a story about Cheetah Mobile applications to technology reporters, they responded negatively. Reporters told FE 2 that they did not find Cheetah Mobile applications useful and it was too difficult to navigate. FE

2 reported this issue to his team, which included FE 1 and other communications and marketing professionals in China, such as Senior Media Relations Manager Nick Hennen[20], Regina Lin[21], Carnation Kang[22] and Christine Fish[23].

50.    FE 2 particularly noted a conflict brewing between FE 2 and Cheetah Mobile's Chinese applications developers over an application that Cheetah Mobile purchased in August 2016 called News Republic.[24] News Republic aggregated news articles from global news outlets and used artificial intelligence to predict what type of news each user would want to read based on their past reading history. Cheetah Mobile filled the application with clickbait articles[25] from disreputable news sources. Although some of the clickbait articles did get clicks from users which in turn generated revenue for Cheetah Mobile, the extensive use of clickbait downgraded the quality and purpose of the application, *i.e.*, created the negative

---

[20]  According to FE 2, Nick Hennen worked at the same office as FE2 in Cupertino, California.

[21]  According to FE 2, Regina Lin was a public relations manager of Cheetah Mobile that worked in China but occasionally traveled to the California office. She oversaw communication efforts for the News Republic App

[22]  According to FE 2, Carnation Kang was based in China. Carnation Kang's LinkedIn page, available at https://www.linkedin.com/in/carnation-kang/?originalSubdomain=uk (last viewed on March 15, 2021), shows that she was a Global Marketing Manager at Leopard Mobile, an alternative brand name that Cheetah Mobile used from time to time for its business, from 2015 to 2018, and the Head of Public Relations at Live.Me from 2018 to 2019.

[23]  According to FE 2, Christine Fish had a leadership position but whose title Thompson did not know.

[24]  The Company disposed News Republic in December 2017 pursuant to 2017 20-F.

[25]  Merriam-Webster defines "clickbait" as "something (such as a headline) designed to make readers want to click on a hyperlink especially when the link leads to content of dubious value or interest." https://www.merriam-webster.com/dictionary/clickbait, last visited March 15, 2021.

user experience that Google had been trying to address by enforcing the anti-disruptive ad policies. Users promptly began deleting it. FE 2 and a team in the Cheetah Mobile's Cupertino, California, office went through and blacklisted disreputable news outlets in an effort to enhance the quality of News Republic, but Cheetah Mobile's management in China resisted. They wanted to keep the clickbait and seemed more interested in metrics than quality. To FE 2, it was a constant struggle to reign in the instincts of the Chinese-based Cheetah Mobile executives on how to operate News Republic.

51.     FE 2 stated that many of the utility and game applications of Cheetah Mobile required users to watch an interstitial ad every time a user clicks within the app before getting to the next step, a disruptive ad practice that Google prohibited. FE 2 said it was common among all of Cheetah Mobile apps. "For God's sake, launch a paid version so that people who are using the app don't have to suffer through this," FE 2 said, "the ads were so irritating." FE 2 mentioned this problem and he suggested launching a paid version of the apps to many of his colleagues, including directly to Charles Chenggong Fan, the Chief Technology Officer of Cheetah Mobile. But they all ignored his suggestions.

52.     When asked about Cheetah Mobile's practice of using disruptive ads, FE 1 acknowledged to Plaintiffs' investigator that ads were displayed in "unexpected ways" that were prohibited by Google's policies. FE 1 stated that

officially, the Company's policy was to follow Google policies. But FE 1 recalled that in 2016 or 2017, Launcher and CM Security, two of Cheetah Mobile's applications, intentionally ran lock screen ads that showed up on a users' phone screen when it was not in use, or locked. Such lock screen ads were one of the disruptive ads that Google prohibits.

53.     FE 1 added that there Google's anti-disruptive ad policies included guidelines on how big the "X" [i.e. the exit sign] to close an ad needed to be. FE 1 recalled that there were some complaints that Cheetah Mobile's ads didn't have a large enough X. FE 1 also recalled complaints of inappropriate ad content, such as advertisements about spying on cheating spouses' infidelities, on games that some children played.

54.     "There were some compliance things that we didn't do as clearly as we should have been," FE 1 said. FE 1 stated that Cheetah Mobile did not emphasize being above-board. The focus was on acquiring more users and increasing all performance metrics even if it meant bending or violating the law, rules or regulations.

55.     "They [i.e. Cheetah Mobile] felt like it was the norm for their industry," FE 1 said, "in some ways, you kind of exist in this zone where violations were like jaywalking. If you're jaywalking, it's illegal. If you're in the street,

sometimes the cop will ticket you. Ninety percent of the time you'll get away with it."

56.     One example of such behavior that FE 1 gave is that Cheetah Mobile had ways to manipulate rankings in the Google Play and Android Store with fabricated ratings and download rates. Cheetah Mobile did this so that its apps would be ranked higher on the store menus so that it could attract more users to download. "All the Chinese companies know how to do it. They all do it," FE 1 said.

57.     FE 1 noted that in November 2018, an article published on Buzzfeed News by Craig Silverman alleged that Cheetah Mobile was committing ad fraud by manipulating data to claim credit for users downloading new apps from Cheetah Mobile-run ads ("November 2018 Buzzfeed Article").[26] FE 1 said that after the November 2018 Buzzfeed Article was published, there was some "back and forth" between FE 1, the reporter, and leadership and executives within the Company as FE 1tried to coordinate a response. FE 1 arranged for Cheetah Mobile executives to meet with Silverman to correct the misconceptions. But the plans for the interview

---

[26]  The articles that FE 1 referred to are available at
https://www.buzzfeednews.com/article/craigsilverman/android-apps-cheetah-mobile-kika-kochava-ad-fraud; Following publication of the November 2018 Buzzfeed Article, Cheetah's ADR price fell $3.32, or nearly 37%, over the next two trading sessions, closing at $5.48 on November 27,2018.

fell apart when Silverman threatened to expose more problems that he uncovered at Cheetah Mobile. FE 1 also met with several crisis communications firms to develop a response to the November 2018 Buzzfeed Article.

58.    FE 1 stated that Google and Facebook, and "pretty much everyone else" with whom Cheetah Mobile had business relationships began reviewing if the allegations in the November 2018 Buzzfeed Article were true. These reviews also looked for any other wrongdoing by Cheetah Mobile. In these audits, partner companies found unrelated problems with Cheetah Mobile apps. "It's kind of like being pulled over for a busted taillight and then the police find drugs in your car," FE 1 said. FE 1 acknowledged that the click fraud described in the November 2018 Buzzfeed Article was present in the Cheetah Mobile app File Manager.

59.    Regarding Google's review, FE 1 stated that a team of Cheetah Mobile employees, led by Tango Yangfan Wu ("Wu"), the head of Cheetah Mobile's Overseas Business Development & Public Relations, were devoted to managing the relationship with Google. The team flew to the Google headquarters and went through a policy review of what Google expected. Defendant Jiang was leading the meetings with Google, with Defendant Fu and Cheetah Mobile's CTO sometimes joining. Google's review prompted the removal of some of Cheetah Mobile's apps from the Google Play store. But Defendants knew that the remaining Cheetah

Mobile apps included features, like data collection and serving of disruptive ads, that violated Chinese law and Google's policies.

60.    FE 1 added that Cheetah Mobile did not have a compliance department and did not place any emphasis on meeting terms and conditions of business partnerships prior to the November 2018 Buzzfeed Article. After that article, the Company formed a committee to do internal checks that was led by Defendant Jiang. FE 1 said that Mr. Wu had been in charge of managing Cheetah Mobile's relationship with Google and now works at Google.

61.    FE 1 stated that both before and after the November 2018 Buzzfeed Article, Cheetah Mobile monitored its ad performance and generated advertising reports that showed how users were engaging with advertisements. An internal dashboard in Cheetah Mobile's system would show all these metrics. The reports would be given to Cheetah Mobile's department heads in business development, advertising, and company leadership. Anyone in a senior vice president role or higher would have access to the dashboard.

62.    When asked whether Cheetah Mobile had any department that is specifically in charge of compliance with Google policies, FE 3 also told Plaintiffs' investigator that "it is the Security Committee, formed by the Legal Department and Security Department." "It was formed approximately in 2018." When asked about this committee's responsibilities, FE 3 stated that the Security Committee was

primarily responsible for establishing the timetable for redressing, forming plans and schedules regarding [Cheetah Mobile's] situations violating Google's policies".

63.     On December 3, 2018 Google said that an internal investigation found that the Company's app File Manager contained code used to execute ad fraud techniques known as click injection and/or click flooding and removed the app from the Google Play store. At the time, app analytics company AppBrain reported that File Manager had been downloaded from the Google Play Store 50 million times. A Google spokesperson said that Google was investigating the apps, and that Google expected to take additional action.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

64.     On April 26, 2017, the Company filed its 2016 20-F, which contained signed certifications pursuant to SOX by Defendants Fu and Ng, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. The 2016 20-F is signed by Defendant Fu and lists Defendant Ng as the Company's "contact person" on the cover page.

65.     The 2016 20-F, in relevant parts, states that

We rely on third-party mobile application distribution channels such as Google Play and iOS App Store to distribute most of our mobile applications to users. In China, where Google Play is not available, we collaborate with similar local distribution channels to distribute our mobile applications. We expect a substantial number of downloads of our mobile applications will

continue to be derived from these distribution channels. As such, the promotion, distribution and operation of our applications are subject to such distribution platforms' standard terms and policies for application developers, which are subject to the interpretation of, and frequent changes by, these distribution channels. **If Google Play, iOS App Store or any other major distribution channel changes their standard terms and conditions in a manner that is detrimental to us, or terminate their existing relationship with us, our business, financial condition and results of operations may be materially and adversely affected.**

(Emphasis added.)

66.    The above generic catch-all risk disclosure was materially false and misleading because Defendants failed to disclose that the Company already was engaging in prevalent disruptive advertising practices on almost all of its applications, violating Google's policies. Such violations had created an existent known risk of removing Cheetah Mobile's applications from Google's platforms and terminating Cheetah Mobile's relationship by Google.

67.    The 2016 20-F, in relevant parts, also states that

**Since our inception, we have worked to monitor the content on our platform and applications and to make the utmost effort to comply with relevant laws and regulations.** However, it may not be possible to determine in all cases the types of content that could result in our liability as a distributor of such content and, if any of the content posted or displayed on our mobile and PC platforms and applications is deemed by the PRC government to violate any content restrictions, we would not be able to continue to display such content and could become subject to penalties, including confiscation of income, fines, suspension of business and revocation of required licenses, which could materially and adversely affect our business, financial condition and results of operations.

*        *        *

**While we have made significant efforts to ensure that the advertisements shown on our mobile and PC platforms and applications are in full compliance with applicable PRC laws and regulations**, we cannot assure you that all the content contained in such advertisements or offers is true and accurate as required by the advertising laws and regulations, especially given the uncertainty in the interpretation of these PRC laws and regulations.

(Emphasis added.)

68.     The above statement was materially false and misleading because Defendants did not make any significant efforts, let alone "utmost efforts", to comply with relevant laws, regulations or policies. In fact, Defendants were knowingly including features in apps that violated Chinese law and Google's policies over the objections of Company employees. The above generic risk disclosure was also materially false and misleading because Cheetah Mobile had been engaging in prevalent disruptive advertising practices on almost all of its applications, violating relevant Chinese laws and regulations. Such violations had created an existent known risk of substantial fines and suspension of business and revocation of required licenses, which could materially and adversely affect Cheetah Mobile's business, financial condition and results of operations.

69.     On April 24, 2018, the Company filed its 2017 20-F, which contained signed certifications pursuant to SOX by Defendants Fu and Jiang, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

The 2017 20-F is signed by Defendant Fu and lists Defendant Jiang as the Company's "contact person" on the cover.

70.     The 2017 20-F, in relevant parts, states that

We rely on third-party mobile application distribution channels such as Google Play and iOS App Store to distribute most of our mobile applications to users. In China, where Google Play is not available, we collaborate with similar local distribution channels to distribute our mobile applications. We expect a substantial number of downloads of our mobile applications will continue to be derived from these distribution channels. As such, the promotion, distribution and operation of our applications are subject to such distribution platforms' standard terms and policies for application developers, which are subject to the interpretation of, and frequent changes by, these distribution channels. **If Google Play, iOS App Store or any other major distribution channel changes their standard terms and conditions in a manner that is detrimental to us, or terminate their existing relationship with us, our business, financial condition and results of operations may be materially and adversely affected.**

(Emphasis added.)

71.     The above generic catch-all risk disclosure was materially false and misleading because Defendants failed to disclose that the Company already was engaging in prevalent disruptive advertising practices on almost all of its applications, violating Google's policies. Such violations had created an existent known risk of removing Cheetah Mobile's applications from Google's platforms and terminating Cheetah Mobile's relationship by Google.

72.     The 2017 20-F, in relevant parts, also states that

**Since our inception, we have worked to monitor the content on our platform and applications and to make the utmost effort to comply with**

**relevant laws and regulations**. However, it may not be possible to determine in all cases the types of content that could result in our liability as a distributor of such content and, if any of the content posted or displayed on our mobile and PC platforms and applications is deemed by the PRC government to violate any content restrictions, we would not be able to continue to display such content and could become subject to penalties, including confiscation of income, fines, suspension of business and revocation of required licenses, which could materially and adversely affect our business, financial condition and results of operations.

\*     \*     \*

**While we have made significant efforts to ensure that the advertisements shown on our mobile and PC platforms and applications are in full compliance with applicable PRC laws and regulations**, we cannot assure you that all the content contained in such advertisements or offers is true and accurate as required by the advertising laws and regulations, especially given the uncertainty in the interpretation of these PRC laws and regulations.

(Emphasis added.)

73.     The above statement was materially false and misleading because Defendants did not make any significant efforts, let alone "utmost efforts", to comply with relevant laws, regulations or policies. In fact, Defendants were knowingly including features in apps that violated Chinese law and Google's policies over the objections of Company employees. The above generic risk disclosure was also materially false and misleading because Cheetah Mobile had been engaging in prevalent disruptive advertising practices on almost all of its applications, violating relevant Chinese laws and regulations. Such violations had created an existent known risk of substantial fines and suspension of business and

revocation of required licenses, which could materially and adversely affect Cheetah Mobile's business, financial condition and results of operations.

74.     On March 25, 2019, Cheetah Mobile conducted the earnings call for Q4 2018 Results. When addressing the allegations made in the November 2018 Buzzfeed Article, Defendant Jiang stated that "to date the company has not identified information inconsistent with its previous disclosures. All of our Board of Directors' swift and decisive actions are a testament to our company's commitment to legal and regulatory compliance."

75.     The above statement was materially false and misleading because Defendants failed to disclose that Cheetah Mobile had never been committed to complying with any relevant laws, regulations or policies. In fact, Defendants were knowingly including features in apps that violated Chinese law and Google's policies over the objections of Company employees. The above statement was materially false and misleading also because Defendants failed to disclose that the Company had been engaging in prevalent disruptive advertising practices on almost all of its applications, violating relevant Chinese laws and regulations and Google policies. Such violations had created an existent known risk of substantial fines and suspension of business and revocation of required licenses, which could materially and adversely affect Cheetah Mobile's business, financial condition and results of operations. Such violations also had created an existent known risk of removing

Cheetah Mobile's applications from Google's platforms and terminating Cheetah Mobile's relationship by Google.

76.    On April 24, 2019, the Company filed its 2018 20-F, which contained signed certifications pursuant to SOX by Defendants Fu and Jiang, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. The 2018 20-F is signed by Defendant Fu and lists Defendant Jiang as the Company's "contact person" on the cover.

77.    The 2018 20-F, in relevant parts, states that

We rely on third-party mobile application distribution channels such as Google Play and iOS App Store to distribute most of our mobile applications to users. In China, where Google Play is not available, we collaborate with similar local distribution channels to distribute our mobile applications. We expect a substantial number of downloads of our mobile applications will continue to be derived from these distribution channels. As such, the promotion, distribution and operation of our applications are subject to such distribution platforms' standard terms and policies for application developers, which are subject to the interpretation of, and frequent changes by, these distribution channels. **If Google Play, iOS App Store or any other major distribution channel changes their standard terms and conditions in a manner that is detrimental to us, or terminate their existing relationship with us, our business, financial condition and results of operations may be materially and adversely affected.**

(Emphasis added.)

78.    The above generic catch-all risk disclosure was materially false and misleading because Defendants failed to disclose that the Company already was

engaging in prevalent disruptive advertising practices on almost all of its

applications, violating Google's policies. Such violations had created an existent

known risk of removing Cheetah Mobile's applications from Google's platforms

and terminating Cheetah Mobile's relationship by Google.

79.    The 2018 20-F, in relevant parts, also states that

> **Since our inception, we have worked to monitor the content on our platform and applications and to make the utmost effort to comply with relevant laws and regulations.** However, it may not be possible to determine in all cases the types of content that could result in our liability as a distributor of such content and, if any of the content posted or displayed on our mobile and PC platforms and applications is deemed by the PRC government to violate any content restrictions, we would not be able to continue to display such content and could become subject to penalties, including confiscation of income, fines, suspension of business and revocation of required licenses, which could materially and adversely affect our business, financial condition and results of operations.
>
> \*      \*      \*
>
> **While we have made significant efforts to ensure that the advertisements shown on our mobile and PC platforms and applications are in full compliance with applicable PRC laws and regulations**, we cannot assure you that all the content contained in such advertisements or offers is true and accurate as required by the advertising laws and regulations, especially given the uncertainty in the interpretation of these PRC laws and regulations.

(Emphasis added.)

80.    The above statement was materially false and misleading because

Defendants did not make any significant efforts, let alone "utmost efforts", to

comply with relevant laws, regulations or policies. In fact, Defendants were

knowingly including features in apps that violated Chinese law and Google's

policies over the objections of Company employees. The above generic risk disclosure was also materially false and misleading because Cheetah Mobile had been engaging in prevalent disruptive advertising practices on almost all of its applications, violating relevant Chinese laws and regulations. Such violations had created an existent known risk of substantial fines and suspension of business and revocation of required licenses, which could materially and adversely affect Cheetah Mobile's business, financial condition and results of operations.

81.     On December 5, 2019, Cheetah Mobile filed a letter, responding to the SEC's November 21, 2019 comments regarding Cheetah Mobile's significant revenue decline from utility products and related services since 2016 and goodwill impairment in the Company's 2018 20-F. The December 5, 2019, Cheetah Mobile letter states, in relevant part, that

> In the overseas markets, certain advertising formats, such as ads on mobile phone lock screens, had been discontinued by Facebook and Google in 2017 and 2018, respectively. In December 2018, our collaborations with some third-party advertising platforms, such as Facebook, were suspended, which had a negative impact on our overseas advertising revenues in the following months. **The Company has been in discussion with some of these platforms to resume business relationship.**
>
> *     *     *
>
> In December 2018, one of the Company's largest customers, Facebook, suspended its cooperation with us. As of December 31, 2018 and April 26, 2019, the date the Company filed its 2018 Form 20-F, **the Company believed that such suspension was temporary and its business relationships with Facebook would resume considering the ongoing**

**communications between the Company and Facebook, and the active remediating actions the Company has been taking as well as the Company's historical cooperation experience with Facebook**.

(Emphasis added.)

82.     As detailed below in the "Additional Allegations Supporting Scienter" section, the above statements were materially false and misleading because Defendants failed to disclose that Cheetah Mobile refused to provide to Facebook a complete copy of the audit report conducted at Facebook's request. Defendants failed to disclose that Cheetah Mobile cancelled a scheduled meeting with Facebook to address Cheetah Mobile's violations of Facebook policies and permanently damaged its business relationship with Facebook.

83.     On December 26, 2019, Cheetah Mobile filed a letter, responding to the SEC December 11, 2019 follow-up comments regarding the Company's 2018 20-F. The December 26, 2019 Cheetah Mobile letter states, in relevant part, that

> The Company respectfully advises the Staff that upon receiving the notification regarding the suspension of advertising collaboration, the Company had been actively communicating with and working with Facebook during Facebook's full review of the Company's recent activities in an effort to resume normal business relationship with Facebook. The **"active remediating actions"** included, among others, (i) direct email communications with Facebook personnel, (ii) written materials to demonstrate that the Company was indeed in compliance with Facebook's policies, (iii) in person meeting with Facebook personnel to explain the Company's business activities, and (iv) engagement of a third party data auditing firm agreed by Facebook to conduct an internal review of the

Company's handling of Facebook's user data in response to Facebook's request. The review concluded that the Company's handling of Facebook's user data is in compliance with the relevant data protection requirements set forth in relevant Facebook policies. Facebook has not yet resumed collaboration with the Company. **The Company undertakes to disclose in future filings of annual report on Form 20-F that the collaboration with Facebook has not been resumed.**

(Emphasis added.)

84.    As detailed below in the "Additional Allegations Supporting Scienter" section, the above statements were materially false and misleading because Defendants failed to disclose that Cheetah Mobile refused to provide to Facebook a complete copy of the audit report conducted at Facebook's request. Defendants failed to disclose that Cheetah Mobile cancelled a scheduled meeting with Facebook to address Cheetah Mobile's violations of Facebook policies and permanently damaged its business relationship with Facebook. The above statements were materially false and misleading also because Defendants failed to disclose that Facebook has not yet resumed collaboration with the Company because Cheetah Mobile stopped communications with Facebook and permanently damaged its business relationship with Facebook.

## **THE TRUTH EMERGES**

85.    On February 20, 2020, Mr. Per Bjorke, Senior Product Manager, Ad Traffic Quality of Google posted an article "Disruptive ads enforcement and our new approach" on Google Security Blog. In that article, Mr. Bjorke stated that

Google had removed nearly 600 apps from the Google Play Store and banned from its ad monetization platforms, Google AdMob and Google Ad Manager, for violating Google's disruptive ads policy and disallowed interstitial policy.[27]

86.    On the same day, Buzzfeed published an article entitled "Google Has Banned Almost 600 Apps For Pushing 'Disruptive' Ads'," which reported that Google had removed applications that violated its anti-disruptive ad policy ("February 20, 2020 Buzzfeed Article"). The February 20, 2020 Buzzfeed Article stated that Per Bjorke had told BuzzFeed News that Google had deployed new technology in late 2019 to automatically detect if apps were displaying ads when the apps were not in use. This new technology helped identify the apps and developers, like Defendants, who had been violating Google's policies. "We give them a notice and a warning [the first time it's detected] and allow them to correct the problem," Bjorke said to Buzzefeed. "And if it's a repeat offense, then it will gradually be a stronger reaction."[28] Despite the February 20, 2020 Buzzfeed Article 's conjecture that all of Cheetah Mobile's applications had been removed from Google platform, Bjorke declined to name specific apps or developers. His reference to "notice and a warning," however, indicated that Google had previously

---

[27]  https://security.googleblog.com/2020/02/disruptive-ads-enforcement-and-our-new.html, lasted viewed on March 15, 2021.
[28]  https://www.buzzfeednews.com/article/craigsilverman/google-bans-android-apps-disruptive-ads.

warned Defendants that Cheetah Mobile's apps were in violation of Google's policies.

87.    On this news, the Company's ADS price fell $0.15 per ADS, or 4%, to close at $3.6 per ADS on February 20, 2020, on unusually heavy trading volume.

88.    On February 21, 2020, before the market opened, the Company disclosed that its Google Play Store, Google AdMob, and Google AdManager accounts were disabled on February 20, 2020 "because some of the Company's apps had not been compliant with Google policies, resulting in certain invalid traffic." Cheetah Mobile stated that the Company expects its ability to attract new users and generate revenue from Google may be materially adversely affected from February 2020. The Company also disclosed that, Cheetah Mobile had generated 22.6% of its total revenues from Google for the first nine months of 2019. Cheetah Mobile indicated that it was seeking to appeal Google's decision. On this news, the Company's ADS price fell $0.61 per ADS, or nearly 17%, to close at $2.99 per ADS on February 21, 2020, on unusually heavy trading volume.

89.    On March 24, 2020, Cheetah Mobile disclosed in its financial results for the fourth quarter and full year ended December 31, 2019 that despite Cheetah Mobile's efforts to appeal Google's decision, Google denied Cheetah Mobile's request to reinstate its accounts after a thorough review. Upon this disclosure, the price of Cheetah Mobile's ADS further dropped $0.07 per ADS, or

3.3% to close at $2.04 per share on February 21, 2020, on a heavy trading volume of over 1 million ADSs traded.

90.    Due to the termination of the Company's advertising collaborations with Google since February 2020, for the first, second and third quarters of 2020, respectively, Cheetah Mobile's revenues from its mobile utility product business in overseas markets decreased by 62.6%, 68.4%, 72% year over year; revenues from the mobile games business decreased by 5.3%, 38.0%, 47.0% year over year. *See* Form 6-Ks filed on June 10, 2020, August 18, 2020 and November 25, 2020.

## ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

91.    Despite Cheetah Mobile's public representations that it had been taking "active remediating actions" to address its misconduct found by Facebook and resume the normal relationship with Facebook, Cheetah Mobile in fact refused to cooperate with Facebook to correct its wrongs.

92.    According to FE 1, after the November 2018 Buzzfeed Article, Facebook uncovered one app, File Manager, that engaged in ad click fraud that the November 2018 Buzzfeed Article exposed which manipulated data to claim credit for users downloading new apps from Cheetah Mobile-run ads. Facebook asked the Company to conduct an audit, which was completed during the last months of FE 1's employment with Cheetah Mobile. FE 1 noted that one thing the Facebook audit found was "reflecting", a technology used for spamming ads. FE 1 confirmed to

Plaintiffs' investigator that the reflecting code was present in multiple Cheetah Mobile Apps. Facebook had banned reflecting. Despite Facebook's request, Cheetah Mobile, however, refused to provide a complete copy of the audit but merely a top-level audit summary. Cheetah Mobile also canceled a meeting at Facebook headquarters with CEO Sheng Fu, other C-level Cheetah Mobile leaders and Senior Vice Presidents attending the moment before it was conducted. Cheetah Mobile's behaviors permanently damaged its relationship with Facebook. According to FE 1, this was typical of Cheetah Mobile executives and exemplified how those executives mishandled problems.

93.    Defendants' scienter is also demonstrated by their statements assuring investors that they were watching the regulatory environment closely and were aware that it could affect the Company's advertising revenues. For example, in response to an analyst's question on a March 25, 2019 earnings call, Defendant Jiang stated that "I think the macro economy does have an impact on the advertising industry . . . . I think the overall industry there probably will be some change under the new regulatory regime, so we are still carefully following the trends. I mean we're carefully following the latest developments in terms of regulatory environment."

94.    Defendant Sheng made similar statements on an earnings call on June 14, 2019, to disclose the Company's Q1 financial results. Defendant Sheng assured

investors that "We are committed to providing the high quality advertising product and service to our business partners. We plan to engage reputable third-party approach, ***encouraging companies to intensively monitor our ad service***. We hope that by taking this additional step we can fully adjust the content our overseas business partners may have as a result of last year's allegation." In other words, Defendant Sheng assured investors that the Company was taking additional steps specifically to monitor its apps' use of advertising.

95.    Based on Form 144s[29], Cheetah Mobile insiders, including Individual Defendants Fu and Jiang sold off massive amounts of their Cheetah Mobile holdings during the Class Period, raking in millions for themselves. Particularly, from November 2019 to March 2020 when Defendants learned about Google's warnings against Cheetah Mobile's disruptive ads practice and its plan to ban most, if not all, of Cheetah Mobile's apps, Cheetah Mobile insiders dumped over 170,000 shares of Cheetah Mobile before the market knew the truth, making estimated aggregate market value of approximately $572,750.

96.    Defendant Fu sold 30,185 Cheetah Mobile shares, pocketing estimated aggregate market value of approximately $102,629.

---

[29] Plaintiffs were able to obtain the Form 144s from a Bloomberg Terminal.

97.     Fax Vision Corporation, a company owned by Defendant Fu and Mr. Ming Xu ("Xu")[30] sold 150,000 Cheetah Mobile shares, pocketing estimated aggregate market value of approximately $ 1,447,500.

98.     Defendant Jiang sold 26,921 Cheetah Mobile shares, pocketing estimated aggregate market value of approximately $91,262.

99.     Xu sold 4,398,529 Cheetah Mobile shares via XaDvision Global Limited, pocketing estimated aggregate market value of approximately $101,754,363.

100.    Charles Chenggong Fan [31] sold 236,571 Cheetah Mobile shares, pocketing estimated aggregate market value of approximately $2,627,526.

101.    Jie Xiao[32] sold 356,850 Cheetah Mobile shares, pocketing estimated aggregate market value of approximately $3,359,518.

102.    Edward Mingyan Sun [33] sold 89,526 Cheetah Mobile shares, pocketing estimated aggregate market value of approximately $596,246.

---

[30] Fax Vision Corporation is a BVI company that is 66.7% owned by Sheng Global Limited, a BVI company wholly owned by Defendant Fu, and 33.3% owned by XaDvision Global Limited, a BVI company wholly owned by Xu. Mr. Xu was the President of Cheetah Mobile from November 2014 to July 21, 2018.
[31] Charles Chenggong Fan was the Chief Technology Officer of Cheetah Mobile since February 2016 to November 30, 2017.
[32] Jie Xiao has been a director of Cheetah Mobile since March 2018, and Senior Vice President since November 2014.
[33] Edward Mingyan Sun has been a Senior Vice President of Cheetah Mobile since 2010.

103.   Yuki Yandan He[34] sold 48,301 Cheetah Mobile shares, pocketing estimated aggregate value of approximately $354,621.

104.   Pin Zhou[35] sold 60,432 Cheetah Mobile shares, pocketing estimated aggregate market value of approximately $313,582.

105.   Ning Zhang[36] sold 189,485 Cheetah Mobile shares, pocketing estimated aggregate market value of approximately $1,201,334.

106.   Ambition & Sincerity Limited[37] sold 125,000 Cheetah Mobile shares, pocketing estimated aggregate market value of approximately $1,500,000.

107.   All-Stars Investment Master Fund[38] sold 880,000 Cheetah Mobile shares, pocketing estimated aggregate market value of approximately $11,422,400.

108.   Meisnow Limited[39] sold 200,000 Cheetah Mobile shares, pocketing estimated aggregate market value of approximately $2,110,000.

109.   A more detailed table is attached hereto as Exhibit 1.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

110.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who

---

[34]  Yuki Yandan He has been a Senior Vice President of Cheetah Mobile since 2010.
[35]  Pin Zhou has been a Senior Vice President of Cheetah Mobile since March 2018.
[36]  Ning Zhang was an Independent Director of Cheetah Mobile.
[37]  No information is available as to its affiliation with Cheetah Mobile.
[38]  An investment company primarily investing in internet and consumer companies in Greater China.
[39]  No information is available as to its affiliation with Cheetah Mobile.

purchased or otherwise acquired Cheetah Mobile ADSs traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

111.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cheetah Mobile ADSs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Cheetah Mobile or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

112.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

113.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class

and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

114.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Cheetah Mobile;

- whether Defendants caused Cheetah Mobile to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Cheetah Mobile securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

115.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

116.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Cheetah Mobile ADSs are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and

- Plaintiffs and members of the Class purchased and/or sold Cheetah Mobile ADSs between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

117.   At all relevant times, the market for Cheetah Mobile's securities was an efficient market for the following reasons, among others:

- Cheetah Mobile's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

- Cheetah Mobile filed periodic public reports with the SEC;

- Cheetah Mobile regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Cheetah Mobile was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. Analysts covering Cheetah Mobile included, without limitation, Jefferies, Credit Suisse, Nomura, Thomson Reuters, Huatai Financial Holdings, CMF International Securities;

- The price of Cheetah Mobile's ADSs reacted to the release of new, material, company-specific information;

- At the beginning of the Class Period, Cheetah Mobile's market capitalization or the total value of all outstanding shares was approximately $1.51 billion;

- As of April 26, 2017, just before the Class Period, Cheetah Mobile reported shares outstanding of approximately 41.561 million ADSs. As of April 26, 2017, the beginning of the Class Period, Cheetah Mobile's equity float, or the number of ADSs outstanding less shares held by insiders and affiliated corporate entities, was approximately 30 million shares;

- Cheetah Mobile had 29 market makers during the Class Period;

- During the Class Period, Cheetah Mobile was entitled to file S-3 Registration Statements in connection with public offerings.

118.   Based upon the foregoing, the market for Cheetah Mobile's securities promptly digested current information regarding Cheetah Mobile from all publicly available sources and reflected such information in Cheetah Mobile's stock price. Under these circumstances, all purchasers of Cheetah Mobile's securities during the Class Period suffered similar injury through their purchase of Cheetah Mobile's securities at artificially inflated prices and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

119.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **ECONOMIC LOSS AND LOSS CAUSATION**

120.   During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated the price of Cheetah Mobile securities and operated as a fraud or deceit on the Class Period purchasers of Cheetah Mobile securities by making the materially false and misleading statements and omissions recited above.

121.   When the truth regarding the risk of Cheetah Mobile's false representations and guidance materialized, the price of Cheetah Mobile securities

declined precipitously as the prior artificial inflation was removed from the price of the shares. As a result of their purchases of Cheetah Mobile securities at artificially inflated prices during the Class Period, Plaintiffs and other members of the Class suffered a substantial economic loss (i.e., damages under the federal securities laws). The price decline in Cheetah Mobile securities was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market. Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and the Class.

122. The declines in Cheetah Mobile securities were caused by the revelation to the market about the true state of Cheetah Mobile's operations. As investors fully understood the risk profile and true nature of Cheetah Mobile's business practices, the price of Cheetah Mobile's securities severely declined harming investors. This resulted in damages to Cheetah Mobile's U.S. shareholders.

**SCIENTER**

123. Each of the Defendants acted throughout the Class Period to make or permit statements that were false and/or materially misleading to the Plaintiffs and other Cheetah Mobile investors.

124. As alleged herein, Defendants acted with scienter in that Defendants had access to the information or knew that the public documents and statements

issued or disseminated in the name of the Cheetah Mobile were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth in detail elsewhere herein, by virtue of their receipt of information reflecting the true facts regarding Cheetah Mobile's business practices, and their control over and/or receipt and/or modification of Cheetah Mobile's materially misleading misstatements, and their associations with the Company which made them privy to confidential proprietary information concerning Cheetah Mobile, participated in the fraudulent scheme alleged herein.

125.   Defendants made these statements with scienter given the fact that they knew, or consciously disregarded with extreme recklessness, the truth about Cheetah Mobile's operations and the production and dilution issues facing the Prestea mine. Despite this knowledge, Defendants disseminated these material misstatements to the investing public.

126.   The Individual Defendants had motive and opportunity to perpetrate the fraudulent scheme described herein because the Individual Defendants were the most senior officers of Cheetah Mobile, issued press releases and statements in investor calls on behalf of Cheetah Mobile, and had the opportunity to commit the

fraud alleged herein.

127.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Cheetah Mobile's business and operations, and to correct promptly any public statements issued by Cheetah Mobile which had become materially false or misleading.

128.   The Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Cheetah Mobile disseminated in the marketplace during the Class Period. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Cheetah Mobile's operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Cheetah Mobile to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Cheetah Mobile within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cheetah Mobile securities.

129.   By reason of their senior management positions and/or being directors of Cheetah Mobile, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Cheetah Mobile to engage in the

unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Cheetah Mobile and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

130.   By virtue of their positions at Cheetah Mobile, Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each Individual Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

131.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Cheetah Mobile. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Cheetah Mobile's

businesses, operations, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Cheetah Mobile securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Cheetah Mobile's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Cheetah Mobile securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

## **NO SAFE HARBOR**

132.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

133.   To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

134.   Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-

looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

135.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Cheetah Mobile who knew that those statements were false when made.

136.   Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, even if they were identified as "forward-looking statements," which they were not, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Cheetah Mobile who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future

economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants

137. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

138. This Count is asserted against Cheetah Mobile and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

139. During the Class Period, Cheetah Mobile and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

140. Cheetah Mobile and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Cheetah Mobile common shares during the Class Period.

141. Cheetah Mobile and the Individual Defendants acted with scienter in that they recklessly disregarded that the public documents and statements issued or disseminated in the name of Cheetah Mobile were materially false and misleading; that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Cheetah Mobile, their control over, and/or receipt and/or modification of Cheetah Mobile allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Cheetah Mobile, participated in the fraudulent scheme alleged herein.

142.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Cheetah Mobile personnel to members of the investing public, including Plaintiffs and the Class.

143.   As a result of the foregoing, the market price of Cheetah Mobile common shares was artificially inflated during the Class Period.   In ignorance of the falsity of Cheetah Mobile's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Cheetah Mobile common shares during the Class Period in purchasing Cheetah Mobile common shares at prices that were artificially inflated as a result of Cheetah Mobile's and the Individual Defendants' false and misleading statements.

144.   Had Plaintiffs and the other members of the Class been aware that the market price of Cheetah Mobile common shares had been artificially and falsely inflated by Cheetah Mobile's and the Individual Defendants' misleading statements and by the material adverse information which Cheetah Mobile's and the Individual

Defendants did not disclose, they would not have purchased Cheetah Mobile's common shares at the artificially inflated prices that they did, or at all.

145.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

146.   By reason of the foregoing, Cheetah Mobile and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Cheetah Mobile common shares during the Class Period.

## COUNT II
### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

147.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

148.   During the Class Period, the Individual Defendants participated in the operation and management of Cheetah Mobile, and conducted and participated, directly and indirectly, in the conduct of Cheetah Mobile's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

149.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information

with respect to Cheetah Mobile's financial condition and results of operations, and to correct promptly any public statements issued by Cheetah Mobile which had become materially false or misleading.

150.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Cheetah Mobile disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Cheetah Mobile to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Cheetah Mobile within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cheetah Mobile ADSs.

151.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Cheetah Mobile.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.


Dated: March 15, 2021                    Respectfully submitted,

                                                      **THE ROSEN LAW FIRM, P.A.**
                                                      By: /s/ Laurence M. Rosen
                                                      Laurence M. Rosen, Esq. (SBN 219683)
                                                      Phillip Kim, Esq. (*pro hac vice*)
                                                      Jing Chen, Esq. (*pro hac vice*)
                                                      355 S. Grand Avenue, Suite 2450
                                                      Los Angeles, CA 90071
                                                      Telephone: (213) 785-2610
                                                      Facsimile: (213) 226-4684
                                                      Email: lrosen@rosenlegal.com
                                                              pkim@rosenlegal.com
                                                              jchen@rosenlegal.com

                                                      **POMERANTZ LLP**
                                                      Jennifer Pafiti (SBN 282790)
                                                      1100 Glendon Avenue, 15th Floor
                                                      Los Angeles, CA 90024
                                                      Telephone: (310) 405-7190

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Email: jpafti@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Putative Class*

1
2

## **CERTIFICATE OF SERVICE**

3

    I hereby certify that on this 15th day of March, 2021, I caused a true and

4

correct copy of the foregoing AMENDED CLASS ACTION COMPLAINT FOR

5

VIOLATIONS OF THE FEDERAL SECURITIES LAWS, to be served by

6

CM/ECF to the parties registered to the Court's CM/ECF system.

7
8

                         /s/ *Laurence M. Rosen*

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28